# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs February 1, 2005

## STATE OF TENNESSEE v. JASON COOK

**Direct Appeal from the Circuit Court for Weakley County**
**No. CR18-2004    William B. Acree, Judge**

---

**No. W2004-01629-CCA-R3-CD  - Filed April 26, 2005**

---

A Weakley County jury convicted the Defendant, Jason Cook, of three counts of forgery and three counts of facilitation of forgery.  The Defendant now appeals, contending that the evidence was insufficient to sustain his convictions.  Finding no error in the judgments of the trial court, we affirm the Defendant's convictions.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ALAN E. GLENN, JJ., joined.

Jeffry T. Washburn (at trial and on appeal) and Paul R. Hutcherson (at trial), Dresden, Tennessee, for the appellant, Jason Cook.

Paul G. Summers, Attorney General and Reporter; David E. Coenen, Assistant Attorney General; Thomas A. Thomas, District Attorney General; and Kevin McAlpin, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
## I.  Facts

This case arises from the Defendant's convictions for crimes involving the forgery of eight checks on July 12 and 13, 2003.  The Weakley County Grand Jury indicted the Defendant and his co-defendant, Jeremy Lee Ellison, on eight counts of forgery.  Ellison subsequently pled guilty to all eight counts.  At the Defendant's trial, the following evidence was presented: Christopher Warren, the victim, testified that, in June of 2003, the Defendant was living in a shed in Warren's back yard.  Warren said that he knew Ellison through the Defendant.  Warren recalled that he previously had a checking account at Greenfield Bank, but he had closed the account prior to July

of 2003. Admitted into evidence were eight checks drawn on Warren's account,[1] and Warren testified that he did not write the checks, and that he never gave the Defendant or Ellison permission to have or to use his checks. He testified that he believed the checks from his Greenfield Bank account had been in one of the document storage boxes that he kept in his shed.

On cross-examination, Warren testified that the Defendant lived in his shed for approximately two months. He said that he never had reason to distrust the Defendant. He explained that, while the Defendant lived with him, he kept a lot of valuable property in his home and shed, and he never noticed anything missing. Warren said that the Defendant has had opportunities to steal large sums of cash from the club where Warren works, and the Defendant never did so. He said that he was familiar with the Defendant's handwriting, and the signature on the forged checks was "no where near what [the Defendant's] regular signature would look like." Warren testified that he has never seen the Defendant with any of the merchandise purchased with the forged checks, and to his knowledge, the Defendant never profited from the merchandise. On redirect-examination, Warren admitted that he was not aware that the Defendant had three prior burglary convictions. He said that the Defendant moved out of his shed "a couple weeks after [Ellison] did. . . . . [Ellison] moved out first."

Tina Adams, an assistant manager at the Wal-Mart in Martin, Tennessee, identified the three checks, #1178, #1179, and # 1180, written to Wal-Mart for the purchase of merchandise on July 12, 2003, and she testified that those checks were returned by the bank because the account was closed. Adams testified that the forged checks matched three receipts for merchandise, which showed the number and account of the check, the time and date of purchase, and the merchandise purchased. Adams said that Wal-Mart has security cameras throughout the store that record, among other things, the monetary transactions at the store. On cross-examination, Adams admitted that she did not work the cash registers, and she was not present when the checks were passed for the merchandise.

Glenda Menees testified that she owns 3J's, a service station and convenience store in Martin, Tennessee, and she handles any returned checks. Menees testified that the three checks, # 1183, # 1185, and # 1195, admitted into evidence were presented at 3J's in exchange for gas and store merchandise on July 12th and 13th of 2003, and the checks were returned because the checking account was closed. She explained that she did not personally accept the checks and could not identify the person who passed the checks.

---

[1]The eight checks entered into evidence are as follows: (1) check # 1178, dated July 12, 2003, payable to Wal-Mart in the amount of $144.09; (2) check # 1179, dated July 12, 2003, payable to Wal-Mart in the amount of $87.18; (3) check # 1180, dated July 12, 2003, payable to Wal-Mart in the amount of $113.65; (4) check # 1182, dated July 12, 2003, payable to Sonic in the amount of $10.00; (5) check # 1183, dated July 12, 2003, payable to 3J's in the amount of $33.00; (6) check # 1185, dated July 13, 2003, payable to 3J's in the amount of $46.43; (7) check # 1194, dated July 13, 2003, payable to Sonic in the amount of $8.04; and (8) check # 1195, dated July 13, 2003, payable to 3J's in the amount of $41.68. Although check # 1178 is actually dated " July 12, 2002", neither party disputes that the check was written on July 12, 2003.

Tren Jones, the head manager at the Sonic Drive-In in Martin, Tennessee, testified that two checks admitted into evidence, # 1182 and # 1194, were presented for food at the Sonic on July 12th and 13th of 2003, and the checks were returned by the bank because the account was closed. Jones did not know which employee accepted the checks, and he did not have personal knowledge of who wrote the checks.

Joey Radford, a lieutenant with the Greenfield Police Department, testified that Officer Sammy Liles, of the Martin Police Department, asked Officer Radford to help identify a suspect on a Wal-Mart security tape. Officer Radford said that he examined the security footage and identified the Defendant. He explained that the video tape depicted the Defendant pushing a shopping cart that contained a small refrigerator. On cross-examination, Officer Radford admitted that he could not be sure that the item the Defendant was pushing in the cart was a small refrigerator. The officer testified that he did not examine any other video tapes or photographs, and he did not see the Defendant or Ellison write any checks to Wal-Mart.

Investigator Sammy Liles, of the Martin Police Department, testified that he investigated the eight forged checks that were drawn on Warren's account in July 2003. Investigator Liles recalled that he obtained surveillance footage from Wal-Mart, but 3J's did not have any security footage. He said that he examined the security tapes from Wal-Mart that matched the time frames in which the checks were written, and attempted to identify the people on the tapes. The investigator recalled that he interviewed the clerks who accepted the forged checks at Wal-Mart and 3J's, but the clerks were not able to recall or identify who wrote the checks. Further, he was never able to identify which employees accepted the checks at the Sonic. The investigator testified that Officer Radford identified the Defendant from the surveillance tapes. He said that he interviewed the Defendant, and the Defendant gave him the following statement:

> I went to Wal Mart [on] July 12th with Jer[e]my Ellison and purchase[d] a refrigerator and I took it to the car and waited for him to return to [the] car when he return[ed] to the car with other items that he purchase[d.]
>
> I went to 3J's July 13th and [Ellison] purchase[d] some gas[.] I stayed in the car[.]
>
> I went to Sonic July 13 and purchase[d] some food. [Ellison] paid it with cash.

Investigator Liles testified that the Wal-Mart security footage showed that the Defendant was in the store for fifty-five minutes, and the three forged checks were passed during the same time frame. Further, the investigator explained that the video footage shows the Defendant leaving the store four minutes after the third check was passed, contradicting the Defendant's statement.

On cross-examination, Investigator Liles testified that the surveillance footage showed Ellison making one of the purchases in Wal-Mart, and the investigator admitted that the Defendant is not visible anywhere in the footage of that transaction. He said that there was not any surveillance footage of the other two transactions. He admitted that none of the clerks were able to identify or

-3-

recall who made the purchases. The investigator admitted that Ellison could have gone to the Sonic more than one time on July 12, and could have written the checks to Sonic when the Defendant was not present. The investigator testified that his notes from his interview with the Defendant reflect that the Defendant stated that Ellison purchased the refrigerator while the Defendant was somewhere else in the store, and the Defendant denied any knowledge of Ellison forging checks. Upon further direct examination, Investigator Liles testified that he showed the security footage to the Defendant, and the Defendant identified Ellison as the man with his arm in a sling, and the Defendant identified himself as the man in the striped shirt.

The Defendant testified that, in 2003, he stayed in Christopher Warren's shed for two or three months, and Ellison also lived with Warren for approximately three or four weeks. He testified that he went to Wal-Mart with Ellison on July 12, 2003, and he and Ellison separated inside the store. The Defendant said that, when he reunited with Ellison, Ellison asked him to take the refrigerator that Ellison had purchased out to the car and wait for him. The Defendant denied knowing that Ellison purchased any items at Wal-Mart, 3J's, or Sonic with forged checks. The Defendant testified that he had no intention of passing forged checks when he entered Wal-Mart, and he did not know that any forged checks were passed. He denied being the person who was pictured walking down an aisle next to Ellison in the security footage. He said that he did not make any purchases at Wal-Mart, and he was never present when Ellison made any purchases. The Defendant recalled that, after Warren told him and Ellison about the returned checks, Ellison became angry and moved out of Warren's shed. The Defendant said that Ellison took several garbage bags full of personal items, including a DVD player and a small refrigerator that Ellison had purchased at Wal-Mart.

On cross-examination, the Defendant reiterated that he met up with Ellison after Ellison purchased the refrigerator, and the Defendant immediately walked the refrigerator out to the car for Ellison. He said that he did not buy anything at Wal-Mart, and he denied being the man that the video footage showed walking through Wal-Mart with Ellison. The Defendant recalled that Ellison took the refrigerator to Warren's shed, where Ellison was living, and used it there, but the Defendant said that he never used the refrigerator himself. The Defendant said that he and Ellison went to 3J's and Sonic together in the Defendant's car on July 13, 2003. He said that Ellison purchased gas at 3J's for the Defendant's car. The Defendant admitted that he had three burglary convictions in 1993. On redirect examination, the Defendant explained that he reunited with Ellison in Wal-Mart about ten feet from the sporting goods counter, where Ellison had purchased the refrigerator, and Ellison asked him to take it to the car. In response to a question from the jury, the Defendant said that he did not know who placed the refrigerator in the shopping cart.

Following this evidence, the jury found the Defendant guilty of three counts of forgery for the three checks written to Wal-Mart; guilty of three counts of facilitation of forgery for the three checks written to 3J's; and not guilty of forgery or facilitation of forgery for the two checks written to Sonic. The Defendant now appeals.

## II. Analysis

On appeal, the Defendant contends that: (1) the evidence is insufficient to sustain his convictions for forgery; and (2) the evidence is insufficient to sustain his convictions for facilitation of forgery.

When an accused challenges the sufficiency of the evidence, an appellate court's standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 324 (1979); State v. Carter, 121 S.W.3d 579, 588 (Tenn. 2003); State v. Smith, 24 S.W.3d 274, 278 (Tenn. 2000). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). This Court may not substitute its inferences for those drawn by the trier of fact from the evidence. State v. Buggs, 995 S.W.2d 102, 105 (Tenn. 1999); Liakas v. State, 286 S.W.2d 856, 859 (Tenn. 1956). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. Liakas, 286 S.W.2d at 859. This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. Id.; see State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000).

According to the Tennessee Code, "[a] person commits an offense who forges a writing with intent to defraud or harm another." Tenn. Code Ann. § 39-14-114(a) (2003). "'Forge' means to: [a]lter, make, complete, execute or authenticate any writing so that it purports to . . . [b]e the act of another who did not authorize that act," or "[i]ssue, transfer, register the transfer of, pass, publish, or otherwise utter a writing that is forged . . . ." Tenn. Code Ann. § 39-14-114(a)(1) (A), (C). A person is criminally responsible for the conduct of another if "[a]cting with the intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense. . . ." Tenn. Code Ann. § 39-11-402(2) (2003). "A person is criminally responsible for the facilitation of a felony if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility . . . the person knowingly furnishes substantial assistance in the commission of the felony." Tenn. Code Ann. § 39-11-403(a) (2004).

Although circumstantial, the evidence is sufficient to sustain the Defendant's three convictions for forgery for the three checks, # 1178, # 1179, and # 1180, written at Wal-Mart on July

12, 2003. At trial, there was testimony that the Defendant was staying in Warren's shed, where Warren believed he kept his checks. The Defendant admitted going to Wal-Mart with Ellison, stating "I went to Wal-Mart July 12th with [Ellison] and purchase[d] a refrigerator and I took it to the car and waited for him to return to [the] car . . . ." The Wal-Mart security footage shows the Defendant and Ellison entering the store, and the Defendant identified himself and Ellison on the security tapes. There was evidence that three purchases were made with forged checks from Warren's account. The Wal-Mart security footage shows Ellison making one of these purchases at the jewelry counter, and it shows the Defendant leaving the store with a refrigerator from another purchase. The Wal-Mart receipts detailed the time of the purchases, the items purchased, the amount of the purchases, and the account and check number of the check drawn for each purchase. Thus, these receipts connected the forged checks to both the purchase Ellison made at the jewelry counter and the refrigerator that the Defendant took from the store. The jury was shown a security video of Ellison and another man, similar in appearance to the Defendant, walking around the store together. Although the Defendant denied that he walked around Wal-Mart with Ellison and denied that he was present when the forged checks were passed, the jury obviously rejected the Defendant's testimony. We conclude that, viewed in a light most favorable to the State, the evidence is sufficient to sustain the Defendant's three convictions for forgery.

Likewise, the evidence is sufficient to sustain the Defendant's three convictions for facilitation of forgery for the three checks written to 3J's. The Defendant admitted that he went to 3J's with Ellison on July 13th. He testified that Ellison purchased gas for the Defendant's car. Although the Defendant asserts that he did not know that Ellison was making the purchases with forged checks, the jury obviously rejected this claim. This evidence is sufficient to support the Defendant's convictions for facilitation of forgery for checks # 1185 and # 1195, written to 3J's on July 13, 2003.

As to check # 1183, written to 3J's on July 12, 2003, the Defendant asserts that there is no evidence that the Defendant knowingly provided substantial assistance in the forgery of this check, and, therefore, there is no evidence to sustain his conviction for facilitation of forgery on this count. The Defendant, however, admitted that he was with Ellison on July 12, and, as the jury found, the two men passed three forged checks at Wal-Mart. Thus, a rational jury could conclude that the Defendant was also with Ellison when Ellison forged check # 1183 at 3J's that same day. Viewing all of the evidence in the light most favorable to the State, we can not say that a rational jury could not conclude that the Defendant knowingly furnished substantial assistance in the forgery of the three checks written to 3J's. This issue is without merit.

### III. Conclusion

In accordance with the foregoing reasoning and authorities, we affirm the Defendant's convictions.

_____
ROBERT W. WEDEMEYER, JUDGE